456

ARIZONA STATE DEPARTMENT OF
PUBLIC WELFARE, Petitioner,

v.

DEPARTMENT OF HEALTH, EDUCA-
TION AND WELFARE, Respondent.

MARICOPA COUNTY LEGAL AID
CLIENTS, Petitioners,

v.

ARIZONA STATE DEPARTMENT OF
PUBLIC WELFARE and Department
of Health, Education and Welfare, Re-
spondents.

Nos. 71-1177, 71-1250.

United States Court of Appeals,
Ninth Circuit.

Sept. 14, 1971.

Rehearing and Rehearing In Banc
Denied Nov. 17, 1971.

No. 71–1177:

Gary K. Nelson, Ariz. Atty. Gen., James B. Feeley, Michael S. Flam, Peter

Sownie, Asst. Attys. Gen., Phoenix, Ariz., for petitioner.

Leonard Schaitman (argued), Morton Hollander, Dept. of Justice, L. Patrick Gary, III, Asst. Atty. Gen., Washington, D. C., Stephanie W. Naidoff, Asst. Regional Atty., James L. Browning, Jr., U. S. Atty., San Francisco, Cal., for respondent.

Jerry Levine (argued), Tempe, Ariz., Mark B. Raven, (argued), Tucson, Ariz. Michael Serwatka (argued), DNA, Inc., Chinle, Ariz., John D Twiname, Administrator, Dept. of HEW, Washington, D. C., for intervenors.

No. 71–1250:

Jerry Levine, (argued), Tempe, Ariz., Mark B. Raven, Tucson, Ariz., Michael Serwatka, DNA, Inc., Chinle, Ariz., for intervenor-petitioner.

Leonard Schiatman (argued), Morton Hollander, Dept. of Justice, L. Patrick Gary, III, Asst. Atty. Gen., Washingon, D. C., Stephanie W. Naidoff, Ass't Regional Atty., San Francisco, Cal., Gary K. Nelson, Arizona Atty. Gen., Phoenix, Ariz., John D. Twiname, Administrator, Dept. of HEW, Washington, D. C., for respondents.

Before KOELSCH, BROWNING and DUNIWAY, Circuit Judges.

DUNIWAY, Circuit Judge:

Following a hearing, the Secretary of Health, Education and Welfare (the Secretary), acting through the Administrator of Social and Rehabilitation Service (the Administrator), determined that certain public-assistance plans of the State of Arizona failed to conform to requirements imposed by federal law and regulations. The Secretary ordered that federal financial support for the affected Arizona public-assistance programs be discontinued for the duration of the nonconformities. In No. 71–1177, Arizona petitions this court for review of the Secretary's final decision, under 42 U.S.C. § 1316(a). Several organizations representing welfare recipients had participated in the hearing as intervenors. Those organizations seek to intervene as respondents in No. 71–1177. In addition, in No. 71–1250 intervenors [1] petition this court for review of a procedural ruling made during the conformity hearing and affirmed by the Secretary. We affirm the Secretary's determinations in No. 71–1177; we dismiss No. 71–1250 for want of jurisdiction.

A. *The Statutory Scheme.*

Pursuant to the Social Security Act (the Act), the federal government provides grants-in-aid to states that administer programs for supplying assistance to specified categories of needy individuals and families. Four such programs are involved here: (1) Old-Age Assistance (OAA) under Title I of the Act, 42 U.S.C. §§ 301–306; (2) Aid to Families with Dependent Children (AFDC) and Child Welfare Services (CWS) under Title IV, 42 U.S.C. §§ 601–610, 620–626; (3) Aid to the Blind (AB) under Title X, 42 U.S.C. §§ 1201–1206; and (4) Aid to the Permanently and Totally Disabled (APTD) under Title XIV, 42 U.S.C. §§ 1351–1355.

States choosing to receive these grants-in-aid are required to formulate plans for administering the assistance programs. The states have free rein in designing many aspects of the plans, such as establishing criteria for need and setting the level of benefits to be paid. The Act, however, prescribes certain requirements with which all state plans must comply. *See* 42 U.S.C. §§ 302(a), 602(a), 1202(a), 1352(a). State plans must be approved by the Secretary before they can be implemented. The Secretary cannot approve any plan unless it meets the specified requirements and, in addition, does not impose as a condition of eligibility for assistance under

---

1. We use the generic term "intervenors" to refer to all the parties before us in these two cases other than Arizona and the Department of HEW. We distinguish among the various intervening parties only in Part D of this opinion; *see* note 10 *infra.*

the plan certain proscribed types of residence or citizenship requirements. 42 U.S.C. §§ 302(b), 602(b), 1202(b), 1352 (b).[2] If a plan fulfills the specified requirements *and* is free from the proscribed conditions, the Secretary must approve it.

Once approved, a state's plan is subject to continuing scrutiny by the Secretary to ensure its continuing conformity to the federally imposed requirements and its continuing freedom from the federally proscribed conditions, both on the face of the plan and in its administration. 42 U.S.C. §§ 304, 604(a), 1204, 1354. Should the Secretary call into question the continuing conformity of the plan or of its administration to federal requirements, he must provide reasonable notice and opportunity for hearing to the state agency administering the plan. If, following a conformity hearing, the Secretary determines that the plan or its administration no longer meets federal requirements, he must terminate further federal payments to the state program until the non-compliance is cured.

Finally, if a state is dissatisfied with the Secretary's final decision, it may file a petition for review of the decision in the appropriate court of appeals. 42 U.S.C. § 1316(a).

### B. *The Background of This Case.*

#### 1. *Administrative proceedings.*

On July 8, 1970, the Secretary of Health, Education and Welfare, acting through the Administrator, notified the Commissioner of the Arizona State Department of Public Welfare that a hearing would be held on August 18, 1970, to determine whether four of Arizona's public assistance plans (OAA; AFDC and CWS; AB; and APTD) were in conformity with federal requirements and, if not, whether federal grants-in-aid

to those programs should be terminated. The Administrator's notice specified four issues to be considered at the hearing, and noted that HEW and Arizona officials had been unable to reach agreement on those issues after extensive negotiations.

The conformity hearing was governed by HEW regulations promulgated on July 29, 1970. 45 C.F.R. Part 213 (originally promulgated in 35 Fed.Reg. 12180).[3] The Administrator delegated the conduct of the hearing to a hearing examiner. 45 C.F.R. § 213.21(a). Pursuant to 45 C.F.R. § 213.15, the hearing examiner granted the petitions of the intervenors to participate in the conformity hearing. In their petitions, the intervenors listed 11 issues, in addition to the four specified in the Administrator's notice, which they sought to have considered at the conformity hearing. The conformity hearing was held on August 18 and 19, 1970. On August 18, the hearing examiner denied intervenors' request to expand the scope of the hearing to include the 11 additional issues, basing his denial on 45 C.F.R. § 213.14 (d). In his Recommended Findings and Proposed Decision, submitted November 27, 1970, the hearing examiner concluded that the Arizona plans were out of conformity in three of the four disputed respects, but that as to the fourth, HEW had not "sustained its burden of proof." Following additional briefing and oral argument, the Administrator determined, on January 26, 1971, that the Arizona plans did not conform with federal requirements with respect to all four issues. He therefore ordered discontinuance, effective April 1, 1971, of federal grants-in-aid to those four programs for the duration of the nonconformities. The Administrator also approved the hearing examiner's denial of intervenors' motion to introduce additional issues. The Administrator's de-

---

2. 42 U.S.C. § 302(b) (Old-Age Assistance) also forbids any "age requirement of more than sixty-five years." 42 U.S.C. § 602 (AFDC and CWS) proscribes certain residency requirements only.

3. Unless otherwise noted, citations are to the Code of Federal Regulations as revised to January 1, 1971.

cision automatically became the final decision of the Secretary. 45 C.F.R. § 213.32(d).

## 2. *Proceedings before this court.*

On February 8, 1971, Arizona filed with this court its petition in No. 71–1177 to review the Secretary's final decision, and also a motion to stay enforcement and execution of the Secretary's termination order pending this court's decision. On February 18, HEW filed a motion agreeing with Arizona's request for a stay, provided that this court would order expedited briefing and argument. On February 22, we granted the stay and ordered the case expedited. On March 5, intervenors moved for leave to intervene in No. 71–1177, and this court granted that motion on March 22, "without prejudice to the right of the Department of Health, Education and Welfare to seek to limit intervenors to the issues presented by the review of the Arizona State Department of Public Welfare."

The petition for review in No. 71–1250 was filed by intervenors on February 22, 1971. It requested (1) review of that part of the Secretary's final decision denying them permission to raise additional issues at the conformity hearing and (2) permission to be heard as respondents on those issues raised by Arizona's petition for review in No. 71–1177. Arizona moved to dismiss intervenors' petition, and on March 10 this court ordered that the ruling on Arizona's motion to dismiss be reserved for the panel hearing the case on the merits. Point (2), however, has already been effectively disposed of by this court's order of March 22 in No. 71–1177, permitting intervenors to respond in that case. Accordingly, the only question left open under Arizona's motion to dismiss relates to point (1) of intervenors' petition.

The waters were subsequently and unfortunately muddied when, on April 9, Arizona filed a second motion to dismiss intervenors' petition in No. 71–1250.[4] On April 26, this court ordered that that motion to dismiss be denied as to point (1) of intervenors' petition, and granted as to point (2). HEW then moved to vacate the April 26 order, requesting us to reserve our ruling on Arizona's second motion to dismiss until after oral argument. Oral argument has since been held, and we have not yet ruled on HEW's motion to vacate.

The flurry of motions in these expedited cases has produced an unfortunate amount of confusion and an apparent contradiction between our March 22 order in No. 71–1177 and our April 26 order in No. 71–1250. To alleviate the confusion, we now grant HEW's motion to vacate our April 26 order in No. 71–1250. To remove any lingering doubts, we affirm our order of March 22, permitting intervention in No. 71–1177. Consequently, we need only dispose of Arizona's motion to dismiss intervenors' petition in No. 71–1250.

## C. *This Court's jurisdiction to Entertain the Petition for Review in No. 71–1250.*

Intervenors' petition for review of that part of the Secretary's final decision denying their request to raise additional issues at the conformity hearing. Arizona's second motion to dismiss asserts that we lack jurisdiction to entertain the petition under 42 U.S.C. § 1316 (a). We agree.

█ Section 1316(a) states, in relevant part:

"(3) Any State which is dissatisfied with * * * a final determination of the Secretary under section 304, 604, 1204, [or] 1354 * * * of this

---

4. Different reasons for granting dismissal were given in Arizona's two motions to dismiss the petition in No. 71–1250. The reasons given suggest that Arizona's first motion to dismiss may have been directed primarily at point (2) of intervenors' petition and that Arizona's second motion may have been directed primarily at point (1). Nonetheless, both motions expressly sought dismissal of the entire petition, and we therefore treat each of them as directed at the entire petition.

title may, within 60 days after it has been notified of such determination, file with the United States court of appeals for the circuit in which such State is located a petition for review of such determination. * * *

* * * * * *

(5) The court shall have jurisdiction to affirm the action of the Secretary or to set it aside, in whole or in part. * * * "

Thus Congress has conferred on this court jurisdiction to entertain petitions for review of the Secretary's decisions following conformity hearings under the Social Security Act. The express grant of jurisdiction is made in section 1316 (a) (5), which does not expressly limit our jurisdiction to petitions filed by certain parties. However, subsection (5) is a part of § 1316, and subsection (3) supplies the context for subsection (5), and subsection (3) provides only for states [5] to file petitions for review. Considered in isolation, the grant of jurisdiction in subsection (5) is unqualified; so to read it, however, is to ignore subsection (3), a part of the same statute. We must and do read subsections (3) and (5) together, as by their express terms conferring jurisdiction on this court to entertain only petitions for review filed by *states* dissatisfied with a final decision of the Secretary.

The legislative history of section 1316 shows that Congress intended to confer jurisdiction only where the petition for review is filed by the state. The purpose of the section was to permit aggrieved states, for the first time, "to receive a judicial determination of their disagreement with the Department [of HEW]" on the issue of nonconformity. 111 Cong.Rec. 2714 (1965) (remarks of Representative Curtis). *See also* Hearings on H.R. 6675, Before the Senate Finance Comm., 89th Cong., 1st Sess., Part I, at 215 (1965) (statement of the Secretary of HEW); H.R.Rep.No.213,

89th Cong., 1st Sess., at p. 131 (1965); 111 Cong.Rec. 3066 (1965) (remarks of Senator Javits).

The courts of appeal are not courts of general jurisdiction; they have only the jurisdiction specifically conferred upon them by acts of Congress. American Federation of Labor v. N. L. R. B., 1940, 308 U.S. 401, 404, 60 S.Ct. 300, 84 L.Ed. 347; Turkel v. F. D. A., 6 Cir., 1964, 334 F.2d 844, 846; 9 Moore's Federal Practice ¶ 110.01, at 47 (2d ed. 1970); cf. American Power & Light Co. v. S. E. C., 1945, 325 U.S. 385, 389–390, 65 S.Ct. 1254, 89 L.Ed. 1683. Section 1316(a) confers upon us jurisdiction to entertain only petitions for review of the Secretary's final decisions that are filed by states. We therefore have no jurisdiction to entertain intervenors' petition in No. 71–1250, unless intervenors can demonstrate that jurisdiction is conferred on us by another source.

Intervenors attempt such a demonstration. Asserting that, as organizations of welfare recipients, they have suffered a "legal wrong" by the Administrator's denial of their request to broaden the scope of the conformity hearing, 5 U.S.C. § 702, intervenors argue that they have standing to seek judicial review and that they are therefore entitled to review in this court. Their argument is faulty. Admittedly the concept of standing is multifaceted and often ill-defined, see, e. g., Tigar, Judicial Power, the "Political Question Doctrine," and Foreign Relations, 17 U.C. L.A.L.Rev. 1135, 1138–39 n. 11 (1970), but it has never been extended so far as to defeat the jurisdictional limitations placed upon this court by Congress. The elemental distinction between a litigant's standing and an appellate court's jurisdictional limitations is fatal to intervenors' argument. Intervenors rely extensively on National Welfare Rights Organization v. Finch, 1970, 139 U.S. App.D.C. 46, 429 F.2d 725, to buttress

---

5. The term "state" is defined in the Social Security Act itself. The term "includes the District of Columbia and the Com-

monwealth of Puerto Rico, * * * the Virgin Islands and Guam." 42 U.S.C. § 1301(a) (1) (3).

their theory. That case held that the National Welfare Rights Organization had standing to intervene in an HEW conformity hearing,[6] a holding reached by analogy to the law of standing to seek judicial review. That case did not involve a petition filed in this court under section 1316(a).[7]

■ At oral argument the question arose whether the Administrative Procedure Act, 5 U.S.C. § 703, taken together with 42 U.S.C. § 1316(a), confers jurisdiction upon this court.[8] Numerous courts have held, as we now hold, that section 703 does not confer upon a court of appeals any additional jurisdiction not expressly authorized by a separate statutory grant of power. State of Wisconsin v. F. P. C., 1961, 110 U.S.App.D.C. 260, 292 F.2d 753, 755; Schwab v. Quesada, 3 Cir., 1960, 284 F.2d 140, 143; Magnolia Petroleum Co. v. F. P. C., 5 Cir., 1956, 236 F.2d 785, 793; City of Dallas v. Rentzel, 5 Cir., 1949, 172 F.2d 122, 123. And see the dicta in Pan American World Airways, Inc. v. C. A. B., 1968, 129 U.S.App.D.C. 159, 392 F.2d 483, 494–495; Ove Gustavsson Contracting Co. v. Floete, 2 Cir., 1960, 278 F.2d 912, 914. We need not decide whether intervenors can, under the Administrative Procedure Act, obtain review of the Secretary's denial in the district court.[9] Cf. National Welfare Rights Organization v. Finch, *supra*, 429 F.2d at 736 (quoting Judge Lumbard's concurring opinion in Rosado v. Wyman, 2 Cir., 1969, 414 F.2d 170, 181, rev'd on other grounds, 1970, 397 U.S. 397, 90 S.Ct. 1207, 25 L.Ed.2d 442); Rettinger v. F. T. C., 2 Cir., 1968, 392 F.2d 454, 457. They cannot do so in this court.

Arizona's motion to dismiss the petition for review in No. 71–1250 must be granted.

D. *Intervenor D.N.A.'s Attempt to Raise the Administrator's Denial in No. 71–1177.*

■ By our order of March 22, 1971, intervenors were permitted to participate in the review in No. 71–1177, "without prejudice to the right of the Department of Health, Education and Welfare to seek to limit intervenors to the issues presented by the review of the Arizona State Department of Public Welfare." In its brief in No. 71–1177, intervenor D.N.A. argues that the Administrator improperly denied its request to raise additional issues at the conformity hearing[10]; for

---

6. National Welfare Rights Organization v. Finch was decided prior to the promulgation of the HEW regulations specifically authorizing intervention in conformity hearings. 45 C.F.R. § 213.15. Those regulations were promulgated in response to the N.W.R.O. case.

7. It should also be noted that the appeal in N.W.R.O. was not taken directly to the court of appeals. Rather, the court of appeals heard the case on appeal from the district court's denial of a preliminary injunction against the Secretary. 429 F.2d at 727.

8. 5 U.S.C. § 703 states: "The form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for declaratory judgments or writs of prohibitory or mandatory injunction or habeas corpus, in a court of competent jurisdiction. * * * "

9. Of course, there is no reason why intervenors must seek review of the Secretary's denial of their request to broaden the conformity hearing. Intervenors wish to show that Arizona's public-assistance plans are in nonconformity with federal requirements in numerous additional ways. They need not have a conformity hearing to do this; they may ask the district court itself to declare that Arizona's plans are in nonconformity and enjoin further administration of the nonconforming features. Such a course has precedent. Bryant v. Carleson, 9 Cir., 1971, 444 F.2d 353. Indeed, considering the interests of the welfare recipients whom intervenors represent, "such a remedy would be preferable to a judgment ordering the cessation of the flow of federal [welfare] funds until the state plan complied with federal law." *Id.* at 360.

10. Briefs were filed in No. 71–1177 by intervenors D.N.A., Inc., Welfare Clients, and by intervenors National Welfare Rights Organization and its Arizona affili-

its argument on this point, intervenor D.N.A. adopts, pursuant to Rule 28(i), F.R.App.P., the arguments made in petitioners' opening brief in No. 71–1250. In short, intervenor D.N.A. seeks to raise in No. 71–1177 the same points which other intervenors sought to raise in No. 71–1250.

The critical portion of D.N.A.'s motion to intervene in No. 71–1177 reads as follows:

"5. D.N.A. therefore seeks leave to intervene in this proceeding [No. 71–1177] in order to participate as a *party-petitioner* with respect to those issues on which it seeks reversal of the Administrator's decision and as a party-respondent with respect to those issues on which it seeks affirmance of that decision. * * *" (Emphasis added.)

Were we to grant D.N.A.'s request to intervene as a party-*petitioner* with respect to that issue, we would be letting in the back door precisely what we have already said should not enter the front door and precisely what Congress has said does not belong in the house at all. Nor would it be proper to permit D.N.A. to introduce its controverted issue in its capacity as party-respondent, a capacity already granted by our March 22 order. Respondents respond; they do not raise issues not raised by the petitioner.

The Department of HEW has exercised its right "to seek to limit intervenors to the issues presented by the review of the Arizona State Department of Public Welfare." We limit intervention in No. 71–1177 to those issues raised by Arizona.

ates. Only intervenor D.N.A. seeks to raise, in No. 71–1177, the point now in question. In a letter to the Clerk of this court, dated April 15, 1971, counsel for intervenors NWRO and affiliates clearly stated his intention to intervene in No. 71–1177 only in response to the points raised by Arizona's petition for review. Leave to intervene in No. 71–1177 was

### E. Arizona's Petition for Review in No. 71–1177.

The Administrator ruled adversely to Arizona with respect to each of the four issues considered at the conformity hearing; Arizona disputes those rulings. In addition, Arizona claims that it was denied procedural fairness during the conformity hearing in various ways. We treat these points *seriatim*.

### 1. Arizona's Residence Requirements.

All public-assistance programs administered by the Arizona State Department of Public Welfare are subject to the provisions of Arizona Rev.Stat. § 46–209, which states:

"A. Any recipient of assistance desiring to reside outside the state for a period not to exceed ninety days shall execute a form provided by the state department [of public welfare]. The form shall require the recipient to express his intent as to establishing legal residence outside the state, or his intent to return to the state within ninety days. If it is the intent of recipient to establish legal residence outside the state, he may continue to receive assistance from this state while residing in another for a period not to exceed three months or until he meets the residence eligibility requirements for assistance in that state, whichever is lesser.

B. A recipient of any assistance granted under this title shall not be continued on assistance after he has been absent from the state for three consecutive months."

These provisions have been incorporated in Arizona's plans for programs administering OAA, AFDC, AB, and APTD assistance.[11] If an Arizona recipient of as-

also granted to Maricopa County Legal Aid Clients; however, they have filed briefs only in No. 71–1250.

11. Arizona State Dep't of Public Welfare, Assistance Payments Manual §§ 3–303.2 (OAA), 3–403.2 (AFDC), 3–503.2 (AB), 3–603.2 (APTD).

sistance under one of these programs leaves Arizona for longer than 90 days, he automatically loses his entitlement to continued assistance; upon his return to Arizona, he must reapply for assistance as a new resident, even if he intended all along to be absent from Arizona only temporarily. Absence from the state for more than 90 days thus raises, as Arizona insists it should, a conclusive presumption of intent to change residence.[12]

At the time of the conformity hearing, the following interim HEW regulation was in effect:

"A State plan which conditions eligibility upon residence in the State may not exclude from eligibility any individual who resides in the State under the following definition:

A resident of a State is one who is living in the State voluntarily and not for a temporary purpose, that is, with no intention of presently removing therefrom. A child is 'residing in the State' if he is making his home in the State. *Temporary absence from the State, with subsequent returns to the State, or intent to return when the purposes of the absence have been accomplished, shall not interrupt continuity of residence.*" 34 Fed.Reg. 8715 (1969), promulgating interim 45 C. F.R. § 202.3(b). (Emphasis added.)

The interim regulation applies to State plans for administering OAA, AFDC, AB, and APTD assistance. *Id.* It has since been replaced by a substantially identical permanent regulation. 45 C.F. R. § 233.40 (promulgated by 35 Fed.Reg. 17719 (1970)).[13]

The HEW regulation and Arizona's automatic-termination provision are obviously inconsistent. The regulation states that any recipient must remain eligible for continued assistance despite his temporary absence from the state, so long as he has an "intent to return when the purposes of the absence have been accomplished." The Arizona requirement states that absence for 90 days by itself terminates eligibility, and that after 90 days any "intent to return" is entirely immaterial to continued eligibility, even though the recipient can prove that he had all along intended to return.

12. Arizona's Opening Brief in No. 71–1177, states, at page 19: "[C]learly absence for 90 days * * * shows an intention to remove from the State permanently. Welfare recipients are not ordinarily prone to tour for months. A regulation that attributes to welfare recipients the habits of gypsies is simply a further indication of the bizarre approach to the problems of the poor promulgated by the Department of Health, Education and Welfare. Poverty severely limits mobility. To suppose that a family living on public assistance could afford to be away from their place of residence for three months is unrealistic in light of their financial condition. An assistance family that has been absent from a state for three (3) months *must* therefore be concluded to have given up residence there." (Emphasis in original.) Arizona makes no mention of possible motivations other than wanderlust for absences greater than 90 days. In particular, Arizona makes no mention of the plight of migrant farm workers or of Arizona residents caring for sick relatives in other states. We find no basis in the record to support a finding either that all absences over 90 days are motivated solely by wanderlust or that an absence of more than 90 days conclusively evidences an intention to give up Arizona residence. *Cf.* Shapiro v. Thompson, 1969, 394 U.S. 618, 631, 89 S.Ct. 1322, 22 L.Ed.2d 600.

13. "A State plan * * * may not impose any residence requirement which excludes any individual who is a resident of the State. For the purposes of this section:
 (a) A resident of a State is one who is living in the State voluntarily with the intention of making his home there and not for a temporary purpose. A child is a resident of the State in which he is living other than on a temporary basis. Residence may not depend upon the reason for which the individual entered the State, except insofar as it may bear upon whether he is there voluntarily or for a 'temporary purpose.'
 (b) Residence is retained until abandoned. Temporary absence from the State, with subsequent returns to the State, or intent to return when the purposes of the absence have been accomplished, does not interrupt continuity of residence."

Arizona does not deny this inconsistency. Nor does Arizona deny that, if the HEW regulation is valid, the Arizona plans are out of conformity with federal requirements. Arizona's sole contention is that the HEW regulation is unauthorized by the Social Security Act and is therefore invalid.[14]

The interim HEW regulation and its successor purport to be authorized by 42 U.S.C. § 1302, which states:

"The * * * Secretary of Health, Education, and Welfare * * * shall make and publish such rules and regulations, *not inconsistent with this chapter*, as may be necessary to the efficient administration of the functions with which [he] is charged under this chapter." (Emphasis added.)

This section grants the Secretary "broad rule-making powers." Thorpe v. Housing Authority, 1969, 393 U.S. 268, 277 n. 28, 89 S.Ct. 518, 21 L.Ed.2d 474, which may extend to the promulgation of requirements binding on states in adopting or administering public-assistance plans. See King v. Smith, 1968, 392 U.S. 309, 317, 319 n. 16, 88 S.Ct. 2128, 20 L.Ed.2d 1118; *cf.* Lewis v. Martin, 1970, 397 U.S. 552, 556, 559, 90 S.Ct. 1282, 25 L.Ed.2d 561. Arizona argues, however, that the Secretary's rule-making power does not extend to the regulation involved here, because the latter is inconsistent with the Social Security Act.[15] In particular, the regulation's definition of "residence" is, according to Arizona, inconsistent with the residency provisions contained in 42 U.S.C. §§ 302(b), 602(b), 1202(b), and 1352(b).

We find no inconsistency between these provisions and the regulation. Although sections 302(b), 602(b), 1202(b), and 1352(b) limit the residency requirements that a state plan may permissibly impose,[16] neither those sections nor any other section in the Act defines "residence" or a "resident." The Secretary has chosen to define those terms in a regulation. His definition has the effect of further limiting the states' permissible choice of residency requirements. But we cannot find the Secretary's definition inconsistent with the letter or the spirit of the Act merely because it holds the states to a higher standard.[17] Compare Lewis v. Martin, *supra* (upholding an HEW regulation de-

---

14. With respect to Arizona's residence requirements and the other provisions of Arizona's plans challenged by HEW, the only question is their literal conformity with valid federal requirement. Arizona's claim to the contrary notwithstanding, we need not decide whether "in the administration of the plan any * * * prohibited requirement is imposed, with the knowledge of [the] State agency, in a substantial number of cases." 42 U.S.C. §§ 304(1), 604(a) (1), 1204(1), 1354(1). Such questions would be appropriate if HEW were challenging Arizona's manner of implementing plan provisions that are in literal conformity with federal requirements. HEW is not.

15. Arizona does not contend that the regulation is not "necessary to the efficient administration of the functions with which [the Secretary] is charged under" the Social Security Act. 42 U.S.C. § 1302. Thus the only question raised under that section is the consistency of the regulation with the Act.

16. 42 U.S.C. § 1352(b) states:

"The Secretary shall approve any plan which fulfills the conditions specified in subsection (a) of this section, except that he shall not approve any plan which imposes, as a condition of eligibility for aid to the permanently and totally disabled under the plan—

(1) Any residence requirement which excludes any resident of the State who has resided therein five years during the nine years immediately preceding the application for aid to the permanently and totally disabled and has resided therein continuously for one year immediately preceding the application * * *."

Sections 302(b), 602(b), and 1202(b) impose residence restrictions which are substantially identical.

17. The definition of "residence" contained in the presently disputed regulation did not spring fully armed from the forehead of the Secretary. As long ago as 1946, the Secretary had defined "residence"

fining "income and resources," 42 U.S.C. § 602(a) (7), which places more stringent requirements on state AFDC programs); and see United States v. Shreveport Grain & Elev. Co., 1932, 287 U.S. 77, 85, 53 S.Ct. 42, 77 L.Ed. 175. The "venerable principle that the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong," Red Lion Broadcasting Co. v. F. C. C., 1969, 395 U.S. 367, 381, 89 S.Ct. 1794, 1802, 23 L.Ed.2d 371, applies here. Accord, Lewis v. Martin, *supra*, 397 U.S. at 559, 90 S.Ct. 1282. No such "compelling indications" are to be found; indeed, the Secretary's definition of "residence" wholly comports with the Act's recognized policy of promoting "[l]iberality of residence requirement." Shapiro v. Thompson, 1969, 394 U.S. 618, 640, 89 S.Ct. 1322, 22 L.Ed.2d 600, discussing 42 U.S.C. § 602(b), and quoting H.R.Rep.No.615, 74th Cong., 1st Sess. at 24, and S.Rep.No.628, 74th Cong., 1st Sess. at 35. We find the Secretary's definition not inconsistent with the Act, and we hold that the interim regulation and its permanent successor fall within the Secretary's rule-making power under 42 U.S.C. § 1302.

Arizona's reliance on the fact that the Secretary promulgated this regulation in response to Shapiro v. Thompson, *supra*, is misplaced. That the regulation was responsive to *Shapiro* is correct. See 34 Fed.Reg. 8715 (1969). It is also correct, as Arizona notes, that the regulation is sufficiently broad to invalidate not only state residence requirements of the sort struck down in *Shapiro*, but also quite distinguishable residence requirements, such as Arizona's here.[18] Arizona errs in concluding, however, that because the regulation creates a remedy broader than the problem to which it was responsive, the regulation is invalid either *pro tanto* or in its entirety. Whatever may have motivated the Secretary to promulgate this regulation, the scope of his rule-making authority under the Social Security Act is limited only by 42 U.S.C. § 1302 and the Constitution. This regulation is within the scope of that authority. It makes no difference that the regulation was not narrowly tailored to deal only with state residence requirements like that in *Shapiro*.

Arizona cites Wyman v. James, 1971 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408, for the proposition that "the U.S. Supreme Court has recognized the permissibility of eligibility requirements not expressly authorized by the Act." If Arizona means to suggest that *some* such eligibility requirements are permissible, we agree; if Arizona means that *all* are permissible then Arizona is wrong. The Supreme Court has never approved state eligibility requirements that conflict with the Act or with valid federal regulations issued pursuant to the Act, nor has any other federal court. The state provisions attacked in Wyman v. James were not alleged to conflict with the Act or with its implementing regulations; a constitutional challenge was made. The Court upheld the state provisions because, *as limited by valid HEW regulations*, the state provisions did not entail unconstitutional state action. See Wyman v. James, *supra*, 400 U.S. at 319, n. 6, and 321, 91 S.Ct. 381 (alternative holding).

■ The Secretary's determination that the Arizona provisions automatically terminating welfare eligibility following a 90-day absence are not in conformity with valid federal requirements must be affirmed.

---

in terms of intent to remain in the jurisdiction. Handbook of Public Assistance Administration, Part IV, §§ 3620, 3650–52 (May 1, 1946). The Supreme Court has since noted that such a definition is "conventional." Shapiro v. Thompson, 1969, 394 U.S. 618, 636 n. 16, 89 S.Ct. 1322, 22 L.Ed.2d 600.

18. The state provision struck down in *Shapiro* denied initial eligibility for welfare assistance to residents who had not resided in the state for at least one year immediately preceding their applications for assistance. The Arizona regulation deals not with initial eligibility, but with continuing eligibility.

2. *Disregard of earned income for AFDC.*

Title IV of the Social Security Act governs federal grants-in-aid to state programs for assistance to needy families with children—the Aid to Families with Dependent Children program (AFDC). 42 U.S.C. §§ 601–610. To obtain federal approval, a state AFDC plan must satisfy an elaborate set of requirements. *Inter alia,* the state plan must, with specified exceptions,

"Provide that the State agency shall, in determining need, take into consideration any other income and resources of any child or relative claiming aid to families with dependent children, or of any other individual (living in the same home as such child and relative) whose needs the State determines should be considered in determining the need of the child or relative claiming such aid, as well as any expenses reasonably attributable to the earning of any such income * * *."

42 U.S.C. § 602(a) (7). The exceptions require that certain "other income and resources" not be taken into consideration by the state—*i. e.,* that they be disregarded. In particular, a state plan must provide that the state agency administering the plan

"(A) shall with respect to any month disregard—

* * * * * *

(ii) in the case of earned income of a dependent child not [a full- or part-time student], a relative receiving

such aid, and any other individual (living in the same home as such relative and child) whose needs are taken into account in making such determination, the first $30 of the total of such earned income for such month plus one-third of the remainder of such income for such month. * * *."

42 U.S.C. § 602(a) (8) (A).[19]

The Secretary has promulgated regulations elaborating on the AFDC income-disregard provision, 45 C.F.R. § 233.20 (a) (11), as well as on income-disregard provisions of other assistance programs under the Act, 45 C.F.R. §§ 233.20(a) (4)–(10).[20] The regulation here in dispute is generally applicable to all income-disregard provisions, although the dispute arises in the context of Arizona's AFDC plan. The disputed regulation, 45 C.F.R. § 233.20(a) (7) (i), states:

"(a) *Requirements for State Plans.* A State Plan for OAA, AFDC, AB, APTD or AABD [Aid to the Aged, Blind or Disabled] must, as specified below:

* * *.

(7) *Disregard of earned income; method.* (i) Provide that the following method will be used for disregarding earned income: The applicable amounts of earned income to be disregarded will be deducted from the gross amount of 'earned income,' and all work expenses, personal and nonpersonal, will then be deducted. Only the net amount remaining will be applied in determining need and the amount of the assistance payment."

19. The purpose of requiring that "other income and resources" be taken into consideration is to ensure that no Little Orphan Annie will receive public assistance if she has a Daddy Warbucks. The accompanying income-disregard provisions were given their present form by the Social Security Amendments of 1967, Pub. L.No.90–248, Tit. II, Part 1, § 202(b), 81 Stat. 881–882. The provisions were redesigned "for the purpose of providing greater incentives for appropriate members of families drawing aid to families with dependent children (AFDC) payments to obtain employment so that they need no longer be dependent on the wel-

fare rolls"; the incentive results from "exempt[ing] a portion of earned income for members of the family who can work." S.Rep.No.744, 90th Cong., 1st Sess. (1967), in 1967–2 U.S.Code Cong. & Admin.News, pp. 2834, 2837. See generally *id.* at pp. 2994–2996.

20. These other provisions are 42 U.S.C. § 302(a) (10) (A) (Old-Age Assistance); 42 U.S.C. § 1202(a) (8) (Aid to the Blind); 42 U.S.C. § 1352(a) (8) (Aid to the Permanently and Totally Disabled); and 42 U.S.C. § 1382(a) (14) (Aid to the Aged, Blind, or Disabled).

Arizona's AFDC plan requires that work-related expenses first be subtracted from the individual's gross income and that the disregarded income then be subtracted from the difference. Thus Arizona applies the income disregard to *net* income, while the HEW regulation requires the income disregard to be applied to *gross* income. The Arizona AFDC plan and the HEW regulation are clearly in conflict. Arizona's sole contention is that the HEW regulation is invalid.

What we have said already about the Secretary's broad rulemaking power under 42 U.S.C. § 1302 applies equally here. The Secretary is beyond any doubt empowered to promulgate uniform regulations governing the complexities of income-disregard accounting. The regulation here in question implements section 402(a) (8) (A) of the Act (42 U.S.C. § 602(a) (8) (A)); it is reasonable on its face.[21] Since we must "give HEW the deference due the agency charged with the administration of the Act," Lewis v. Martin, *supra*, 397 U.S. at 559, 90 S.Ct. at 1286, we hold that the disputed regulation is valid.

Arizona suggests that the Secretary's income-disregard regulation infringes the state's "undisputed power to set the level of benefits and the standard of need," King v. Smith, *supra*, 392 U.S. at 334, 88 S.Ct. at 2142, and that it ignores the mandatory "recognition that the federal law gives each State great latitude in dispensing its available funds," Dandridge v. Williams, 1970, 397 U.S. 471, 478, 90 S.Ct. 1153, 1158, 25 L. Ed.2d 491. The "power" and "latitude" possessed by the state are circumscribed by the scope of valid and applicable federal statutes and regulations. Within that circumscription the states are free to tailor their assistance programs as they deem best. They may not, however, contravene valid federal requirements except at pain of losing their federal grants-in-aid, King v. Smith, *supra*, 392 U.S. at 333 n. 24, 88 S.Ct. 2128, 20 L.Ed. 2d 1118; see Oklahoma v. United States Civil Service Comm'n, 1947, 330 U.S. 127, 143, 144, 67 S.Ct. 544, 91 L.Ed. 794. Moreover, the income-disregard provision here in question does not reduce Arizona's "great latitude in dispensing its available funds." It merely requires Arizona to make the calculations on the

---

21. Arizona asserts that the calculational method it favors is the only method that makes "common sense." We find this assertion specious. HEW's Interim Policy Statement No. 4 of July 17, 1968, specified that the state, "in determining the amount of an individual's monthly earned income, will deduct all work expenses, personal and nonpersonal, from gross income" *before* applying the income disregard. Notice of Interim Policies and Requirements, § 3(D) (4), 33 Fed.Reg. 10231 (1968). That is, the Interim Policy Statement adopted the method that Arizona now espouses. Interim Policy Statement No. 4 became, with certain modifications, 45 C.F.R. Part 233, which incorporates the HEW regulation here in question. The modifications of the provisions of the Interim Policy Statement were made after "[v]iews of interested persons were requested, received, and considered, and in the light thereof. * * *" 34 Fed.Reg. 1394 (1969).
"The following are the major changes: (1) The method for disregard of earned income has been modified. In arriv-

ing at the amount of earned income to be applied against the assistance budget the amount to be disregarded is to be deducted from gross income rather than from net income. Next, the amount allowed for work expenses is to be deducted."
*Id.* It is therefore clear that considerable care and reflection, on the part of persons thoroughly experienced in welfare administration, went into designing the method of income disregard, and that as a result the method espoused by Arizona was deliberately abandoned. On that ground alone we would be loath to find the method finally adopted by HEW to be utterly lacking in "common sense." In any event, we think it entirely reasonable for the Secretary to interpret "earned income" in the Acts' disregard provisions, 42 U.S.C. § 602(a) (8) (A), as referring to gross earned income. Nothing in the legislative history negates this broader reading of "earned income," and common usage supports it. See Webster's Third New International Dictionary 714 (1965).

basis of which it allocates its AFDC funds in a particular way. Compare, *e. g.,* Ramos v. Montgomery, S.D.Cal., 1970, 313 F.Supp. 1179, aff'd mem., 1971, 400 U.S. 1003, 91 S.Ct. 572, 27 L.Ed.2d 618.

■ The Secretary's determination that the method used by Arizona to calculate AFDC income disregard is not in conformity with valid federal requirements must be affirmed.

3. *State-level advisory committee for AFDC and CWS.*

45 C.F.R. Part 220, Subpart A, requires that:

> "The State plans for AFDC and CWS pursuant to title IV, parts A [AFDC] and B [CWS] of the Social Security Act must, with respect to the administration of the service programs for families and children,
>
> (a) Contain provisions committing the State to meet the requirements in this subpart.
>
> \* \* \* "

45 C.F.R. § 220.1. One such requirement, and the one disputed by Arizona, is the following:

> "An advisory committee on AFDC and CWS programs must be established at the State level and at local levels where the programs are locally administered, except that in local jurisdictions with small caseloads alter-

nate procedures for securing similar participation may be established. \* \* \* "

45 C.F.R. § 220.4(a).[22] Arizona's plan for administering AFDC and CWS assistance and services does not provide for an advisory committee, and is therefore in nonconformity with the requirement. As in the case of the preceding two issues, Arizona does not deny the inconsistency between its plan and the regulation, but attacks the regulation as invalid.

Arizona claims, once again, that the Secretary has exceeded his rule-making authority under 42 U.S.C. § 1302 in promulgating the regulation requiring an AFDC-CWS advisory council. Arizona's claim is two-fold: first, that the requirement is "inconsistent with the intended purpose of the Social Security Act," and second, that it is not "necessary to the efficient administration of the functions" with which the Secretary is charged under the Act.

■ Arizona's initial argument that the requirement is inconsistent with the Act is based upon 42 U.S.C. § 602(a) (3), which states that:

> "A State plan for aid and services to needy families with children must \* \* \* either provide for the establishment or designation of a single State agency to administer the plan, or provide for the establishment or designation of a single State agency

---

22. The regulation goes on to state:
"The State plan must show that the advisory committee will:
(1) Advise the principal policy setting and administrative officials of the [State] agency and have adequate opportunity for meaningful participation in policy development and program administration, including the furtherance of recipient participation in the program of the agency.
(2) Include representatives of other State agencies concerned with services, representatives of professional, civic or other public or private organizations, private citizens interested and experienced in service programs, and recipients of assistance or services or their representatives who

shall constitute at least one-third of the membership. Such recipients or their representatives must be selected in a manner that will assure the participation of the recipients in the selection process and that they are representative of recipients of assistance or services.
(3) Be provided such staff assistance from within the agency and such independent technical assistance as are needed to enable it to make effective recommendations.
(4) Be provided with financial arrangements, where necessary, to make possible the participation of recipients in the work of the committee structure."

to supervise the administration of the plan. * * * "

Arizona contends that the advisory committee would be *de facto* a second agency, in addition to the state's own properly designated public-assistance agency, resulting in more than "a single State agency" administering the state plan.

The contention holds no water. As the Administrator's decision notes, "the committee's role is purely advisory and entails none of the administrative functions which fall within the province of the single State agency which is required by Section 402(a) (3) [42 U.S.C. § 602(a) (3)]." With or without the advisory committee, the responsibility for making the actual administrative decisions and for implementing them rests in a single set of hands—those of the state agency. The Secretary's regulation requires the advisory committee to "have adequate opportunity for meaningful participation in policy development and program administration, including the furtherance of recipient participation in the program of the agency." 45 C.F.R. § 220.4(a) (1). But this requirement does not relieve the state agency of any of its administrative authority or responsibility; it merely requires the agency to solicit and consider the advisory committee's views as a part of the agency's own decision-making process. The decisions themselves remain with the agency.

■■■ Arizona argues that the Secretary's regulation is inconsistent with the Act in another way. Arizona notes that certain provisions of the Act expressly require the creation of various advisory bodies. 42 U.S.C. §§ 622(a) (1) (C) (ii), 1314(a), 1314(f).[23] Arizona then reasons that "[t]hese sections express the final will of Congress on the advisory council issue. Applying the rule of statutory construction, *expressio unius est exclusio alterius*, it is clear Congress did not intend that the Secretary of HEW force other advisory council requirements upon the states."

We cannot accept this reasoning. The maxim *expressio unius* "is a product of 'logic and common sense,'" 2 Sutherland on Statutory Construction § 4916, at 415 (3d ed. Horack, 1943), and is properly applied only when the result to which its application leads is itself logical and sensible. K. Llewellyn, The Common Law Tradition: Deciding Appeals, at page 521, (1960); *cf. id.* at 526 (paired maxims no. 20). Neither logic nor common sense supports applying the maxim here. The Social Security Act comprehends a complex aggregation of enactments, amendments, and repeals ranging over a period of 36 years. More than most statutes, the Act was and is responsive to the changing landscape of American society; its beneficent purposes would be stultified by rigidly attributing to each Congressional attempt to improve the Act's responsiveness a concomitant Congressional intent not to permit further administrative improvements by those charged with the Act's implementation. *See* 2 Sutherland on Statutory Construction, *supra*, § 4917, at 421; 3 *id.* § 6604, at 287–288. Thus, this is another one of those instances in which "too much is claimed for" the maxim, United States v. Barnes, 1912, 222 U.S. 513, 519, 32 S.Ct. 117, 56 L.Ed. 291, and we decline to apply it here. We conclude that the Act's express provision for the creation of certain other advisory bodies is in no way inconsistent with the creation of the AFDC–CWS advisory committee by administrative regulation.

---

**23.** Section 622(a) (1) (C) (ii) requires "an advisory committee, to advise the State public welfare agency on the general policy involved in the provision of day care services under the [State's CWS] plan." Section 1314(a) requires the Secretary to appoint an Advisory Council on Public Welfare "for the purpose of reviewing the administration of the public assistance and child welfare services programs * * * and making recommendations for improvement of such administration * * *." Section 1314 (f) permits the Secretary to appoint "such advisory committees as he may deem advisable to advise and consult with him in carrying out any of his functions under this chapter."

■ Arizona's second contention, that the advisory committee is not "necessary to the efficient administration of the [Secretary's] functions" within the meaning of 42 U.S.C. § 1302, is equally without merit. Congress expressly recognized the importance of adequate administrative methods to the success of AFDC–CWS programs. 42 U.S.C. § 602(a) (5), dealing with those programs, supplements the Secretary's general rule-making powers under section 1302; it states that:

"A State plan for aid and services to needy families with children must * * * provide (A) such methods of administration * * * as are found by the Secretary to be necessary for the proper and efficient operation of the plan * * *."

The advisory-committee requirement provides just such a method. That the Secretary in fact found the advisory committee "to be necessary for the proper and efficient operation of" state AFDC–CWS plans appears from his Interim Policy Statement No. 8, 33 Fed. Reg. 10234–35 (1968). That he was entitled to so find follows from his responsibility for administering the various Social Security programs, and from his reasonable discretion in fulfilling that responsibility under 42 U.S.C. §§ 1302 and 602(a) (5). It also follows from the fact, as pointed out in the Administrator's decision, that

"[i]n the past, the welfare system of this country has been subject to the

criticism that it is closed and unresponsive to the needs of the very people it is designed to serve. In light of this fact, 45 C.F.R. § 220.4(a) [the advisory-committee requirement] represents a reasonable minimum requirement designed to open up lines of communication between those who administer the AFDC program and AFDC recipients."

Whether the advisory-committee requirement is in fact "necessary for the proper and efficient administration of the [state's] plan"—and Arizona asserts it is not—is not the question before us. The question is rather whether the Secretary found that it was necessary, and whether that finding was reasonable. He did, and it was.[24]

■ Finally, we note Arizona's claim that the advisory-committee requirement "makes a sham of the State's power to create its own offices in derogation of the Tenth Amendment and violates the spirit of cooperative federalism upon which the entire welfare program is grounded." The claim is frivolous. On the question of constitutionality, see Oklahoma v. United States Civil Service Commission, *supra*, 330 U.S. at 142–144, 67 S.Ct. 544, which is directly in point. See also Sperry v. Florida, 1963, 373 U.S. 379, 403, 83 S.Ct. 1322, 10 L.Ed. 2d 428. And compare the preamble to the Social Security Act (49 Stat. 620) with U.S.Const. art. 1, § 8, cl. 1 ("to provide for the general welfare"). On the question of "cooperative federalism," which is of course no talisman,[25] see

24. 42 U.S.C. § 1316(a) (4) states that "The findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive." Because the conformity hearing dealt specifically with Arizona's public-assistance programs, no facts were adduced bearing on the broader question whether the advisory-committee requirement itself was reasonably necessary. However, the evidence adduced concerning Arizona's programs would have been sufficient, as HEW's brief notes, to support a finding "that Arizona has failed to provide welfare recipients with an adequate opportunity to participate in the welfare system, and that the isolation of

the Arizona state agency has made the system unresponsive to the needs of welfare recipients." Such a finding was unnecessary, since the only question was Arizona's literal compliance with the advisory-committee requirement.

25. The phrase seems to have been first used by Professor Corwin: "It is this last type of National-State cooperation, effected by means of the Federal grant-in-aid, which best realizes the ideal of Cooperative Federalism." Corwin, National-State Cooperation—Its Present Possibilities, 8 The American Law School Review 687, 704 (1937). Professor Corwin was speak-

King v. Smith, *supra*, 392 U.S. at 316 & 333 n. 34, 88 S.Ct. 2128; Oklahoma v. United States Civil Service Comm'n, *supra*, 330 U.S. at 144, 67 S.Ct. 544.

 The Secretary's determination that in failing to create an AFDC–CWS advisory-committee, Arizona has contravened valid federal requirements must be affirmed.

### 4. *Arizona's legal-custody requirement for AFDC.*

Arizona's plan for administering AFDC assistance contains the following provision:

"A relative of a natural parent who is an Aid for Dependent Children recipient cannot be approved for an Aid for Dependent Children grant on behalf of any of the children of said parent unless said relative or the [Arizona] Department of Public Welfare has legal custody of the child or children named in the application. The custody order will be waived in cases where due to the illness of the parent it is the medical recommendation that responsibility for all of the children not be undertaken by the parent for a given period of time."

Arizona State Dep't of Public Welfare, Assistance Payments Manual § 3–401.3, ¶ 3. The questions involving this provision to be resolved at the conformity hearing were:

"[1] whether the State plan provision for the AFDC program that the caretaker-relative or the welfare department must have legal custody of a child whose siblings are also receiving AFDC in the home of their natural parent(s) in order for such child to be eligible for AFDC, is in compliance with [42 U.S.C. § 602(a) (10)], and [2] whether such exclusion from eligibility for AFDC of similarly situated children on a basis unrelated to need is a reasonable classification consistent with the provisions and purposes of Title IV-A of the Social Security Act."

The hearing examiner's Recommended Findings concerning these two questions are, in their entirety, as follows:

"The Government, which is the moving party herein, has not sustained its burden of proof that the exclusion provided for in section 3–401.3 of the State Assistance Manual is not in compliance with [42 U.S.C. § 602(a) (10)] and is an unreasonable and therefore invalid classification under the provisions and purposes of Title IV-A of the Act."

The Administrator declined to follow the Recommended Finding.[26] His conclu-

---

ing of arrangements whereby "the national power to tax and spend is used to provide financial *inducement* to the States to exert their reserved powers in the furtherance of the legitimate objectives of national expenditure." *Id.* (emphasis added). Like a carrot, an inducement may have strings attached.

**26.** The Administrators' reasoning was as follows:

"[The hearing examiner] did not explain what [his] conclusion as to 'burden of proof' meant. If [his] statement meant, as some of the third parties have interpreted it, that the Hearing Examiner only considered evidence introduced by counsel for the Government, then the Hearing Examiner was in error. * * * It would frustrate the spirit of the decision in [NWRO v. Finch, 1970, 429 F.2d 725] to allow * * * outside parties to introduce

evidence, but then to disregard this evidence in formulating a decision."
Arizona does not argue that this reasoning is incorrect. In its only reference to the difference between the hearing examiner and the Administrator with regard to the legal-custody issue, Arizona's brief states:

"HEW's Administrator saw fit to overrule his own hearing officer's finding that the State's legal custody requirement was in compliance with applicable federal standards. Considering that the hearing officer's decision was based on first hand information, his opinion should be adopted by the Court."
Obviously, Arizona mistakes the import of the hearing officer's conclusion, treating it as a determination that, as a matter of law, the legal-custody requirement complies with federal requirements. Accepting Arizona's assertion at face value —as an attack on the substance of the

sion, based on a review of the entire record, was

> "that the Arizona 'legal custody' requirement violates the doctrine of 'equitable treatment' and renders the State's AFDC plan out of conformity with [42 U.S.C. § 602(a) (10)]."

It is clear from the Administrator's analysis and conclusion that he found Arizona's legal-custody provision out of conformity with 42 U.S.C. § 602(a) (10) only because he found it in violation of the "doctrine of equitable treatment." [27] It is equally clear from HEW's brief in this case that the gravamen of HEW's objection to the legal-custody provision is its alleged nonconformity with that doctrine. Thus the questions on appeal, as posed by the briefs and arguments in this case, are (1) whether the "doctrine of equitable treatment," through 42 U.S.C. § 602(a) (10), imposes a valid federal requirement on state AFDC plans, and (2) if so, whether Arizona's legal-custody provision contravenes that requirement.

■ We decline to answer these questions as posed. Instead, we hold that Arizona's legal-custody provision is in direct conflict with the requirements of 42 U.S.C. § 602(a) (10), even without the intermediation of the equitable-treatment doctrine. Section 602(a) (10) requires " * * * that aid to families with dependent children shall be furnished * * * to all eligible individuals * * *."

The purposes of AFDC programs are set out in 42 U.S.C. § 601:

> "For the purpose of encouraging the care of dependent children in their own homes *or in the homes of relatives* by enabling each State to furnish financial assistance and rehabilitation and other services, as far as practicable under the conditions in such State, to needy dependent children and the parents *or relatives with whom they are living* to help maintain and strengthen *family* life and to help such parents *or relatives* to attain or retain capability for the maximum self-support and personal independence consistent with the maintenance of continuing parental care and protection, there is authorized to be appropriated for each fiscal year a sum sufficient to carry out the purposes of this part. The sums made available under this

---

Administrator's conclusions—we decline to discuss the merits of the "burden of proof" question.

27. The HEW brief refers to the equitable-treatment doctrine as "a long-standing construction of the Act by HEW and all predecessor agencies responsible for the administration of the public assistance programs under the Act. Under the 'equitable treatment' doctrine, a state plan for public assistance must contain only those eligibility conditions other than those specified in the Act which result in similar treatment of individuals in similar circumstances; further, the state may not impose exclusions, or differences in treatment, of such individuals if they bear no reasonable relationship to the purposes of the Act."

The doctrine is not expressed in any of the Act's provisions, nor has it been promulgated by regulation. *See* Note, Welfare's "Condition X", 76 Yale L.J. 1222 (1967). Congress has validated one application of the doctrine by writing the so-called "Flemming ruling" into the Act.

Pub.L.No.87–31, § 4, 75 Stat. 77 (1961) (adding 42 U.S.C. § 604(b)). See King v. Smith, *supra*, 392 U.S. at 322–323, 88 S.Ct. 2128, 20 L.Ed.2d 1118; Note, *supra*, 76 Yale L.J. at 1224–25. Recognition has occurred during a Congressional debate of "a requirement in the law that requires equal treatment of recipients and uniform administration of a program within a State." 113 Cong.Rec. 23055 (1967) (remarks of Rep. Wilbur Mills during debate on H.R. 12080, 90th Cong., 1st Sess., enacted as the Social Security Amendments of 1967, Pub.L.No.90–248, 81 Stat. 821). The doctrine has apparently been followed in its only judicial test. Arizona v. Ewing, D.D.C., 1953, Civil No. 2008–52 (unreported), remanded with instructions to dismiss for lack of jurisdiction sub nom. Arizona ex rel. Arizona State Board of Public Welfare v. Hobby, 1954, 94 U.S.App. D.C. 170, 221 F.2d 498. At least one court has more recently declined to rule on the doctrine's validity. Russo v. Shapiro, D.Conn., 1969, 309 F.Supp. 385, 389 n. 3.

section shall be used for making payments to States which have submitted, and had approved by the Secretary, State plans for aid and services to needy families with children." (Emphasis added.)

42 U.S.C. § 606 defines the terms used in the AFDC provisions of the Act. It contains the following definitions:

"(a) The term 'dependent child' means a needy child (1) who has been deprived of parental support or care by reason of the death, continued absence from the home, or physical or mental incapacity of a parent, *and who is living with his father, mother, grandfather, grandmother, brother, sister, stepfather, stepmother, stepbrother, stepsister, uncle, aunt, first cousin, nephew, or niece*, in a place of residence maintained by one or more of such relatives as his or their own home * * *;

(b) The term 'aid to *families* with dependent children' means money payments with respect to * * * a dependent child or dependent children, and includes (1) money payments * * * to meet the needs *of the relative with whom any dependent child is living* * * *

(c) The term 'relative with whom any dependent child is living' means the individual *who is one of the relatives specified in subsection (a) of this section and with whom such child is living* * * *." (Emphasis added.)

Thus, a "needy child * * * who has been deprived of parental support or care" is just as much a "dependent child" within the meaning of the Act when he lives with a relative as when he lives with a parent. 42 U.S.C. § 606(a). A "famil[y] with dependent children" is just as much a "family" within the meaning of the Act when it consists of the child and a relative other than a parent as when it consists of the child and a parent. *Id.* §§ 601, 606(b). And a relative qualifies as a "relative with whom any dependent child is living" within the

meaning of the Act whenever his or her relationship to the child is one of those specified and the child is actually living with him or her. *Id.* § 606(c). A similar symmetry between "parents" and "relatives" inheres in the Act's purposes. "[T]he care of dependent children" is to be equally encouraged whether the dependent child lives with a parent or a relative. *Id.* § 601. "[F]amily life" is to be "maintain[ed] and strengthen[ed]" just as much when a dependent child lives with a relative as when he lives with a parent. *Id.*

The provisions quoted above thus make it perfectly clear that the Act views the AFDC eligibility of a relative with whom a child is living exactly the same as the eligibility of the child's parent. If a child is "dependent" and if he lives with either a parent or a relative, then the parent or relative is eligible for AFDC assistance on behalf of the child. The Act no more permits any otherwise eligible category of relatives to be automatically rendered totally ineligible for AFDC assistance, on the basis of conditions not found in the Act, than it permits any category of parents to be. And the Act does not permit the latter. See King v. Smith, *supra.*

Although the precise question under discussion is, so far as our research has shown, one of first impression, dicta in other cases support our reading of the Act. Referring to 42 U.S.C. §§ 606(a) and (b), one court has noted that

"the definitions contain no limitation on eligibility by reason of the fact that one, who is otherwise a 'dependent child,' resides in a household with or without one or more other siblings or other persons. Nor do the definitions or any other portion of the Act vest in any state the authority to embroider upon the definition of 'dependent child,' so as to insert conditions and limitations beyond those imposed by Congress."

Williams v. Dandridge, D.Md., 1969, 297 F.Supp. 450, 455 (footnote omitted), rev'd on other grounds, 1970, 397 U.S.

471, 90 S.Ct. 1153, 25 L.Ed.2d 491. Accord, Dews v. Henry, D.Ariz., 1969, 297 F.Supp. 587, 591. And in King v. Smith, *supra*, 392 U.S. at 330, 88 S.Ct. at 2140, the Supreme Court found it unlikely

"that Congress, at the same time that it intended to provide programs for the economic security and protection of *all* children, also intended arbitrarily to leave one class of destitute children entirely without meaningful protection." (Emphasis in original.)

Arizona's legal-custody requirement therefore, conflicts with the treatment of relatives' AFDC eligibility required by the Act. It automatically and categorically denies AFDC eligibility to "[a] relative of a natural parent who is an Aid for Dependent Children recipient" unless that relative (or the Arizona State Department of Public Welfare) has legal custody of the child. Thus, suppose a mother has two children, one of whom lives with her, and suppose the mother receives AFDC assistance. If the other child is living with his or her "grandfather, grandmother, brother, sister, * * * uncle, aunt, first cousin, nephew, or niece," 42 U.S.C. § 606(a), that relative cannot receive AFDC on behalf of the child unless the relative (or the Department of Public Welfare) has legal custody of the child. The Act does not countenance a state's imposition of such a condition.

Arizona makes several claims on behalf of its requirement, with none of which we agree. *First,* Arizona asserts that the requirement is "[i]n strict conformity with the federal Aid to Families with Dependent Children program objectives 'to help maintain and strengthen family life,' " because it discourages the splitting-up of parents and children. As we have pointed out, however, a "family" within the meaning of the AFDC provisions of the Act does not comprehend only the child and his parents. A household consisting of the child and his "grandfather, grandmother," etc., is as much a "family" within the meaning of the Act as is a household consisting of the child and his mother or father. *See*

*especially* 42 U.S.C. §§ 601, 606(b), quoted *supra*. This point is particularly critical in this case, since, as the evidence showed and as the Administrator pointed out, "a common, if not the predominant cultural pattern among Mexican-Americans and Indians in Arizona is the 'extended family.' Under this cultural system, it is common for children to be sent to live for short periods of time with relatives. In order to receive AFDC, however, these relatives would have to undertake the burdensome and costly task of acquiring legal custody, which may invest the resulting situation with a degree of permanence that is unacceptable to everyone concerned." Thus Arizona's legal-custody requirement falls especially heavily on Arizona's Mexican-American and Indian minorities.

*Second:* Arizona asserts that it has a legitimate interest in conserving its public-assistance funds so that it may assist as many unrelated families to as great an extent as possible. It wishes to encourage dependent children to live in the same household, in order to take advantage of "the greater ability of large families—because of the inherent economies of scale—to accommodate their needs to diminished per capita payments." Dandridge v. Williams, 1970, 397 U.S. 471, 479–480, 90 S.Ct. 1153, 1159. Legitimate though that interest is, it cannot prevail over the requirements of the Act. Arizona's "interest in economically allocating its limited AFDC resources may be protected by its undisputed power to set the level of benefits and the standard of need, and by its taking into account in determining whether a child is needy all actual and regular contributions to his support." King v. Smith, *supra*, 392 U.S. at 334, 88 S.Ct. at 2142. Arizona may also protect that interest by imposing a fixed upper limit on the total amount of money any one family unit may receive, Dandridge v. Williams, *supra*, or by paying to each AFDC recipient a fixed percentage of his actual needs, Ward v. Winstead, N.D.Miss., 1970, 314 F.Supp. 1225, 1233, appeal dismissed for untimely fil-

ing, 1971, 400 U.S. 1019, 91 S.Ct. 587, 27 L.Ed.2d 630; *cf.* Rosado v. Wyman, 1970, 397 U.S. 397, 413–414, 90 S.Ct. 1207, 25 L.Ed.2d 442. Arizona may not protect that interest by declaring ineligible for AFDC assistance persons whom Congress has said shall be eligible.[28]

*Third:* Arizona argues the practical desirability of having children living with adults legally responsible for them, in order "that in case of medical emergency one capable of consenting to treatment, whether the Welfare Department or a relative, will be available," and in order to cure "problems that arise when a child needs permission to marry, authorization to participate in school activities or permission to obtain a [driver's] license." These claimed practical advantages are of questionable significance; certainly nothing in the record suggests that they ought to be given great weight. And in any event, weighty or not, they do not justify deviation from the Act's requirements.

*Fourth:* Arizona invokes the special interest that a state has in regulating "the marriage and family relationship." But such regulation is not in question here. What is in question is whether Arizona can use federally provided funds in a manner at odds with the conditions specified by Congress for their use.

Arizona's AFDC plan does not fulfill the mandatory condition "that aid to families with dependent children shall be furnished with reasonable promptness to *all* eligible individuals." 42 U.S.C. § 602 (a) (10) (emphasis added).

5. *Arizona's attack upon the conformity-hearing process.*

Arizona contends that it was denied procedural fairness during the conformity hearing. Recognizing that "[t]he word 'person' in the context of the Due Process Clause of the Fifth Amendment cannot, by any reasonable mode of interpretation, be expanded to encompass the States of the Union," South Carolina v. Katzenbach, 1966, 383 U.S. 301, 323, 86 S.Ct. 803, 816, 15 L.Ed.2d 769, Arizona finds a requirement of procedural fairness in other sources. In particular, Arizona claims that the Tenth Amendment "embodies the State's constitutionally nonexplicit fundamental rights that are protected by the Federal Constitution." Arizona also argues that the Ninth Amendment reserves to its citizens "fundamental individual protections not enumerated in" the Constitution, and that Arizona is acting as *parens patriae* of its citizens in this case; thus, the argument concludes Arizona "is the only one with standing to protect [its citizens'] rights in this unique situation where the damage to individuals arises from unfair treatment of the State as the representative of its people."

Although Arizona may in appropriate situations assert claims as *parens patriae* on behalf of its citizens, *see, e. g.,* Hawaii v. Standard Oil Co. of

---

28. Arizona cites Dandridge v. Williams, *supra,* for the proposition that its legal-custody requirement is valid, quoting the following language: "We see nothing in the federal statute that forbids a State to balance the stresses that uniform insufficiency of payments would impose on all families against the greater ability of large families—because of the inherent economies of scale—to accommodate their needs to diminished per capita payments. The strong policy of the statute in favor of preserving family units does not prevent a State from sustaining as many families as it can, and providing the largest families somewhat less than their ascertained per capita standard of need." 397 U.S. at 479–480, 90 S.Ct. at 1159. The

Maryland maximum-grant limitation upheld in *Dandridge* is, however, quite different from the Arizona legal-custody requirement. The Supreme Court found that "the practical effect of the Maryland regulation is that all children, even in very large families, do receive some aid. We find nothing in 42 U.S.C. § 602(a) (10) (1964 ed., Supp. IV) that requires more than this. So long as some aid is provided to all eligible families and all eligible children, the statute itself is not violated." 397 U.S. at 481, 90 S.Ct. at 1159. The evil of Arizona's legal-custody requirement is that, under it some eligible families and some eligible children receive no aid.

California, 9 Cir., 1970, 431 F.2d 1282 and cases cited, cert. granted, 1971, 401 U.S. 936, 91 S.Ct. 931, 28 L.Ed.2d 215, the situation here is not an appropriate one. The very basis of this proceeding is HEW's attempt to assure that Arizona citizens receive benefits conferred upon them by Congress; the federal government, through the Department of HEW, is itself acting as *parens patriae* in seeking to vindicate individual rights created by federal statute and jeopardized by Arizona. In such a situation, Arizona cannot act as *parens patriae* against the federal government. See South Carolina v. Katzenbach, *supra*, 383 U.S. at 324, 86 S.Ct. 803 and cases cited.

■■■ As for Arizona's Tenth Amendment claim, we find Oklahoma v. United States Civil Service Commission, *supra*, apposite. That case involved a hearing the purpose of which was, like the conformity hearing here, to determine whether the state had adhered to conditions attached to grants of federal funds. *See* § 12 of the Hatch Act, 54 Stat. 767–770 as amended (now codified at 5 U.S.C. Ch. 15). Responding to Oklahoma's claim that its sovereignty had been violated, the Court noted that

> "The Tenth Amendment has been consistently construed 'as not depriving the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end.' [quoting United States v. Darby, 1941, 312 U.S. 100, 124, 657, 61 S.Ct. 451, 462, 85 L.Ed. 609.] * * * A hearing was had, *conformably to § 12*, and the conclusion was reached that Mr. Paris' active partipation in politics justified his removal from membership on the Highway Commission. Oklahoma chose not to

remove him. We do not see any violation of the state's sovereignty in the *hearing* or order." 330 U.S. at 143, 67 S.Ct. at 553 (emphasis added).

Like Arizona here, Oklahoma was a party to the administrative hearing; unlike Arizona, Oklahoma did not allege specific procedural shortcomings. Notwithstanding this distinction, we think the *Oklahoma* case refutes Arizona's reliance on the Tenth Amendment. To go further and read the Tenth Amendment as incorporating *specific* guarantees of procedural fairness would exceed even an expansive reading of the Amendment's proper scope. At very most the Amendment reserves certain powers to the states, *cf.* Sperry v. Florida, 1963, 373 U.S. 379, 403, 83 S.Ct. 1322, 10 L.Ed.2d 428; it assuredly does not incorporate a Bill of Procedural Rights for the states.

Since Arizona's constitutional objections to the hearing procedures are not tenable, the procedures of which Arizona complains must be upheld if they are properly authorized by statute or regulation.[29] We now turn to Arizona's specific complaints.

■■■ *First:* The pre-hearing notice given Arizona specified only the issues to be treated, and did not disclose the nature of the evidence or the identity of the witnesses to be presented. Arizona applied to the Administrator for a continuance in order to be able to discover who and what would be presented by HEW. The application was denied by the hearing examiner. Arizona now contends that only the Administrator is authorized to grant or deny continuances, 45 C.F.R. § 213.12,[30] and that the hearing examiner violated that regulation in doing so instead. However, 45 C.F.R.

---

29. The intervenors note that a possible source of general procedural-fairness requirements in the conformity-hearing process might be the statutory requirement of "reasonable notice and opportunity for hearing." 42 U.S.C. §§ 304, 604(a), 1204, 1354. Since Arizona does not make that argument, we decline to discuss it.

30. "§ 213.12—*Time of Hearing.* The hearing shall be held not less than 30 days nor more than 60 days after the date notice of the hearing is furnished to the State, unless the Administrator and the State agree in writing to hold the hearing at another time."

§§ 213.21(a), 213.22(a) (1), and 213.22 (a) (5) clearly authorize the hearing examiner to grant and deny continuances.[31] We cannot say, on the basis of the record before us, that the hearing examiner abused his discretion in denying Arizona's application for a continuance. Nor does it appear that Arizona was seriously prejudiced: At the conclusion of the hearing the examiner asked counsel for Arizona if they needed a continuance in order to respond to evidence adduced at the hearing, and counsel said they did not.

[22] *Second:* The hearing examiner confined himself to taking evidence and ruling on the conformity of Arizona's plans with the Secretary's regulations. He declined to rule on Arizona's contentions that HEW's policies and regulations contravened the Act. Arizona now claims that "[b]y forcing the State into a limited forum that was unable to consider the merits of its case, the Department of Health, Education, and Welfare effectively denied Arizona the opportunity of challenging it, thereby ignoring the fundamental ethic of fair play. * * * " The administrative forum, however, was not limited to the conformity hearing. Before reaching a final decision, the Administrator held a hearing for the sole purpose of permitting Arizona to argue its contentions that the HEW regulations were invalid. Arizona filed extensive briefs in support of those contentions. The Administrator's final decision expressly treated the question of the regulations' validity. Arizona was not denied the opportunity to argue all of its contentions during the administrative proceedings.

■ *Third:* Arizona claims that the participation of welfare recipients as intervenors in a conformity hearing is unauthorized by the Act. This amounts to an assertion that 45 C.F.R. § 213.15(b) (1) [32] is beyond the Secretary's broad rule-making power under 42 U.S.C. § 1302. It is not. See especially National Welfare Rights Organization v. Finch, 1970, 139 U.S.App.D.C. 46, 429 F.2d 725. Arizona's references to dicta in Rosado v. Wyman, 1970, 397 U.S. 397, 406, 426, 90 S.Ct. 1207, 25 L.Ed.2d 442, are inapposite, since that case antedated the Secretary's promulgation of 45 C.F.R. Part 213.

■ *Fourth:* Arizona seems to argue that because it admitted noncompliance with certain HEW regulations, no evidentiary hearing was necessary, and that holding one denied Arizona procedural fairness. Not only is the argument illogical; its premises are also at odds with Arizona's insistence that it should have been granted a continuance and with Arizona's claim that HEW bore "the burden of showing that [Arizona's] non-compliance based on residency * * is involved in a substantial number of cases." Arizona also asserts that wholly irrelevant testimony was continually admitted into evidence, thereby turning the hearing into "a two-day diatribe covering the full spectrum of conceivable social ills. * * *." Since Arizona does not point to any specific evidence whose improper introduction was prejudicial, we decline to respond to the assertion.

---

31. "§ 213.21—*Who Presides.* (a) The presiding officer at a hearing shall be the Administrator or, at his discretion a hearing examiner assigned under 5 U.S.C. § 3105 or 3344.

"213.22—*Authority of Presiding Officer.* (a) The presiding officer shall have the duty to conduct a fair hearing, to avoid delay, maintain order, and make a record of all the proceedings. He shall have all powers necessary to accomplish these ends, including, but not limited to, the power to:

(1) Change the date, time, and place of the hearing, upon due notice to the parties.

* * * * *

(5) Rule on motions and other procedural items on matters pending before him."

32. "Other individuals or groups may be recognized as parties, if the issues to be considered at the hearing have caused them injury and their interest is within the zone of interests to be protected by the governing Federal statute."

*Fifth:* During the conformity hearing the examiner ruled that witnesses testifying adversely to Arizona could "decline to give the names of the individuals whom they are referring to in their testimony." The ruling was intended to protect welfare recipients referred to against any possible retaliation by the Arizona State Department of Public Welfare in the form of "extra strict enforcement of legal requirements." Arizona now argues that the ruling hampered its ability to determine the veracity of the testifying witnesses. We have reviewed the testimony affected by this ruling, and we find no significant prejudice to Arizona. If believed, the testimony tended to show that the various features of the Arizona public-assistance plans here in issue operated so as to make it substantially more difficult for eligible Arizona residents to obtain public assistance. But, as Arizona has recognized, this case presents for decision only the questions whether the disputed provisions of Arizona's plans are, on their face, in conformity with federal requirements. The Administrator did not, and we do not, examine the actual administration of those plans. Thus the testimony of which Arizona complains is at best irrelevant, and not prejudicial.

*Sixth:* Arizona claims that the HEW regulations governing "Practice and Procedure for Hearings to States on Conformity of Public Assistance Plans to Federal Requirements," 45 C.F.R. Part 213, were not adopted in accordance with the notice requirements of 5 U.S.C. § 553, and that they are therefore invalid. Section 553(b) renders the notice requirements inapplicable "when the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." In promulgating the conformity-hearing regulations, the Secretary stated:

> "Notice of proposed rule making has been dispensed with, * * * since notice and public procedure thereon

are impracticable. Hearings with respect to the conformity of the plans of a number of States * * * have been scheduled on various days in August and September 1970 and it is urgent that the parties to such hearings know forthwith the rules of procedure and practice that are applicable to the conduct of such hearings."

35 Fed.Reg. 12180 (July 29, 1970). The stated reasons are "good cause" for foregoing notice. *Cf.* Buckeye Cablevision, Inc. v. F. C. C., 1967, 128 U.S.App.D.C. 262, 387 F.2d 220, 228 n. 34. Indeed, the Secretary obviously acted with Arizona's legitimate interests in mind. The rules were validly promulgated.

In No. 71–1250, the proceeding is dismissed.

In No. 71–1177, the decision is affirmed.

The stay order issued by this court on February 22, 1971, is vacated.